**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JEAN ALIX LOUIS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 12-918 (ESH)** |
| | ) |
| **DISTRICT OF COLUMBIA,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## MEMORANDUM OPINION

Plaintiff Jean Alix Louis, individually and as a representative of the estate of Jean Edny Louis, has sued the District of Columbia and Metropolitan Police Department ("MPD") Officer Paul Riggins, in his individual and official capacity, under 42 U.S.C. § 1983 and assorted provisions of state law. The suit grows out of an encounter between plaintiff's mentally ill brother, Jean Edny Louis ("Louis"), and MPD officers, during which Officer Riggins fatally shot Louis. Before the Court is defendants' Motion for Summary Judgment. ("Mot.", Feb. 19, 2014 [Dkt. No. 35].) Having considered the record and the parties' briefs, and for the reasons stated below, the Court will grant defendants' motion as to plaintiff's federal-law claims and dismiss plaintiff's remaining state-law claims without prejudice for lack of jurisdiction.

## FACTUAL BACKGROUND

On June 14, 2011, the MPD was called to Louis's apartment to assist the D.C. Mobile Crisis Unit in effecting an FD-12 application for Louis's emergency hospitalization. (FIT Report, Aug. 29, 2012 [Dkt. No. 40-1 Ex. C] at 1.) Louis had been acting irrationally, and his case manager and the Mobile Crisis Unit had concluded he needed emergency psychiatric services pursuant to D.C. Code § 21-521 (2003).

When MPD officers arrived at Louis's apartment, the three mental health professionals on the scene informed the officers that Louis was in an agitated state and was armed with a screwdriver. (FIT Report at 1.) At the time, Louis was located inside the bathroom. (*Id.*) After fifteen to twenty minutes of failed attempts to convince Louis to exit the bathroom, the officers attempted to enter. (Dep. of Gordon Peterson, Oct. 3, 2013 [Dkt. No. 35-7] at 48-49.) When the door opened, Louis swung an eleven-inch screwdriver with an artificially sharpened, seven-inch blade at the officers and stabbed Officer Rafeal Sarita in the right arm, causing a puncture wound. (*Id.* at 49-50; FIT Report at 1; Incident-Based Event Report, June 14, 2011 [Dkt. No. 35-1] at 2.) Officer Sarita sprayed a one-second burst of OC (pepper) spray at Louis, who, unfazed, threw water at the officers and slammed shut the bathroom door. (FIT Report at 1.) The commanding officer on the scene then declared a barricade situation and requested the Special Operations Division Emergency Response Team ("ERT") to respond to the scene. (*Id.*)

Upon arriving at Louis's apartment building, the ERT members were briefed on prior events, including Louis's stabbing of Officer Sarita with the screwdriver. (Dep. of Robert Glover, Dec. 10, 2013 [Dkt. No. 35-6; 40-1 Ex. E] at 174-75; Dep. of Paul Riggins, Dec. 17, 2013 [Dkt. No. 35-9; 40-1 Ex. M] at 344.)) ERT members were also informed that in prior instances requiring Louis's emergency hospitalization, it had taken several officers to subdue Louis. (Glover Dep. at 175.) The ERT established sniper observation posts with lines of sight into Louis's bathroom and formed a tactical entry team. (FIT Report at 2; *see* Glover Dep. at 176.) A short time later, the tactical entry team entered Louis's apartment with ERT negotiators. (FIT Report at 2.)

ERT negotiators unsuccessfully attempted to negotiate with Louis for around an hour and a half. (Glover Dep. at 81.) The negotiators failed to establish a meaningful dialogue with

Louis, who would repeat (in English)[1] what the negotiators said to him, speak unintelligibly, or not respond at all. (*Id.* at 121; FIT Report at 2.)

During the negotiations, Louis went silent for approximately twenty minutes. (Glover Dep. at 106.) Members of the sniper team informed the tactical team that Louis was sitting on the toilet and appeared either asleep or unconscious. (*Id.*) Commanding officer Lieutenant Robert Glover, concerned about Louis's safety and also concerned that this "might be the only opportunity to safely take [Louis] into custody," authorized a tactical plan for a four-man team to safely apprehend Louis. (*Id.* at 105-06.) Under the plan, Officer Mark Wascavage was to breach the door, and Officers Paul Riggins, Gregory Robinson, and William Powell were to enter the bathroom, in that order. (Dep. of William Powell, Dec. 10, 2013 [Dkt. No. 35-8; 40-1 Ex. D] at 94.) Although the officers wore protective gear and shields, their necks, arms and thighs were exposed, (Defendants' Statement of Facts ("DSOF"), Feb. 19, 2014 [Dkt. No. 35] ¶ 10), and the shields were not designed to protect against sharp objects. (Dep. of Mark Wascavage, Dec. 17, 2013 [Dkt. No. 35-11; 40-1 Ex. P] at 88.) Before entering, Officer Riggins looked through a hole in the bathroom door and personally observed Louis sitting on the toilet seat with his head dropped, appearing to be either asleep or unconscious. (Riggins Dep. at 68-69.)

Less than one minute later, Officer Wascavage breached the bathroom door with a one-man battering ram. (DSOF ¶ 1; Riggins Dep. at 69; Powell Dep. at 129.) Upon entering the bathroom, Officer Riggins realized that Louis was no longer sitting on the toilet, but was now positioned behind the bathroom door with a screwdriver in his right hand. (Riggins Dep. at 346.) Louis then pushed himself against the door to try to keep Officer Robinson from entering behind

---

[1] Louis was bilingual. He could speak, understand, read, and write in English, but also spoke Haitian Creole. (Glover Dep. at 71-72.) The ERT requested a Haitian Creole translator to use during negotiations, but because the officers established that Louis could communicate in English, the translator was not used. (*Id.*)

Officer Riggins. As Officer Robinson pushed back against the door, Louis swung the screwdriver—which he held pointing downward—in a stabbing motion around the door multiple times at Officer Robinson. (Riggins Dep. at 31-32, 346; Dep. of Gregory Robinson, Jan. 3, 2014 [Dkt. No. 35-10; 40-1 Ex. N] at 197.) At this point, Officer Riggins—between three and five feet from Louis (Riggins Dep. at 288, 323 (less than three feet); Dep. of Charles Key, Jan. 31, 2014 [Dkt. No. 38-17] at 163 (up to five feet))—believed that Louis had stabbed Officer Robinson. (Riggins Dep. at 54, 322, 346.) Officer Riggins threw down his can of OC spray and drew his service pistol, at which point Louis slid along the door and raised the screwdriver in a stabbing motion toward Officer Riggins. (*Id.* at 42, 189, 317, 322.) Officer Riggins fired two shots at Louis, hitting Louis once in the right side of the head and once in the right shoulder. (*Id.* at 21, 23, 41-42, 189.) Louis fell unconscious immediately. (DSOF ¶ 9.) The confrontation in the bathroom lasted between only seven and ten seconds (Robinson Dep. at 197), during which Officers Robinson and Riggins were unable to see one another. (*Id.* at 198.) Although an EMT-certified ERT member attempted first aid on Louis, Louis was later pronounced dead at Howard University Hospital. (FIT Report at 2.) Approximately four hours passed between the time officers were originally called to Louis's apartment and when Louis was shot. (*See id.* at 1-2.)

Plaintiff, as a representative of Louis's estate and Louis's survivor, filed this suit against the District of Columbia and "John Doe Police Officers" on June 6, 2012. (Compl., June 6, 2012 [Dkt. No. 1].) On October 2, 2012, plaintiff added Officer Riggins as a named defendant. (First Amd. Compl., Oct. 2, 2012 [Dkt. No. 9].) On September 5, 2013, plaintiff filed his second amended complaint, which contained two federal- and four state-law counts: (1) an excessive force claim under 42 U.S.C. § 1983 against Officer Riggins; (2) a municipal liability claim under section 1983 against the District of Columbia; (3) a state-law assault and battery claim against

both defendants; (4) a state-law negligent excessive force claim against both defendants; (5) a state-law survival act claim against both defendants; (6) a state-law wrongful death claim against both defendants. (Second Amd. Compl. ("SAC"), Sept. 5, 2013 [Dkt. No. 31] ¶¶ 28-54.) Discovery has closed and defendants now move for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual disagreement is insufficient to preclude summary judgment: a dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *accord Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). However, a court should not consider a non-moving party's "unsubstantiated allegations." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Indeed, "summary

judgment 'is *most likely* when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury.'" *Arrington v. United States*, 473 F.3d 329, 343 (D.C. Cir. 2006) (quoting *Johnson v. Wash. Metro. Area Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989)).

## ANALYSIS

### I.      SECTION 1983 CLAIMS

#### A.      Count V – Excessive Force

Plaintiff's central federal-law claim under section 1983 is that Officer Riggins used excessive force when breaching the bathroom and when he fatally shot Louis.  (SAC ¶¶ 42-43; Opp'n at 13-14.)  Officer Riggins claims that his actions are protected by qualified immunity. (Mot. at 5.)

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by "protect[ing] 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, -- U.S. ---, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Under this doctrine, government officials are shielded from money damages unless a plaintiff demonstrates "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 2080.  A court has the discretion to determine which prong of the qualified immunity analysis to undertake first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, -- U.S. ---, 134 S. Ct. 2012, 2020 (2014); *accord Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").[2] The "reasonableness" inquiry is an objective one, *Graham*, 490 U.S. at 397, and is analyzed from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.* at 396. Stated succinctly, "[a]n officer will only be held liable if the force used was so excessive that no reasonable officer could have believed in the lawfulness of his actions." *Rogala v. Dist. of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998).

Courts consider the reasonableness of force based on the "the totality of the circumstances," *Plumhoff*, 134 S.Ct. at 2020, including "the severity of the crime at issue," whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," and whether the suspect "pose[d] an immediate threat to the safety of the officers or others." *Graham,* 490 U.S. at 396. This allows "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397.

---

[2] Plaintiff also purports to bring excessive force claims pursuant to the due process clauses of the Fifth and Fourteenth Amendments. (SAC ¶ 42.) However, because the District of Columbia is not a state, but a "political entity created by the federal government, it is subject to the restrictions of the Fifth Amendment, not the Fourteenth." *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)). Moreover, the Fifth Amendment does not apply to claims that law enforcement officers utilized excessive force during the course of an arrest. *Graham*, 490 U.S. at 395; *accord Armbruster v. Frost*, 962 F. Supp. 2d 105, 111 (D.D.C. 2013). The Court will therefore grant summary judgment to defendants as to plaintiff's excessive force claims brought pursuant to the Fifth and Fourteenth Amendments.

The Supreme Court has articulated a narrower "reasonableness" standard for the use of deadly force. "[I]t is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead." *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11. "But '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to . . . us[e] deadly force.'" *Brosseau*, 543 U.S. at 197-98 (quoting *Garner*, 471 U.S. at 11). Thus, "if the suspect threatens the officer with a weapon . . . deadly force may be used." *Garner*, 471 U.S. at 11; *accord Buruca v. Dist. of Columbia*, 902 F. Supp. 2d 75, 86 (D.D.C. 2012) (concluding that officer's use of deadly force was reasonable when suspect pointed pistol at officer); *Wallace v. Dist. of Columbia*, 685 F. Supp. 2d 104, 110 (D.D.C. 2010) (concluding that two officers' use of deadly force was reasonable when the officers faced an armed individual who put his gun to his head, then moved his hand towards one of the officers); *White v. United States*, 863 F. Supp. 2d 41, 48-49 (D.D.C. 2012) (concluding that officers' use of deadly force was reasonable when an individual pointed his gun at one of the officers). "'[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.'" *Wallace*, 685 F. Supp. 2d at 111 (quoting *Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009)).

"Although [courts] evaluate the reasonableness of the officers' actions by viewing the events from their perspective," courts must at summary judgment "consider the facts in the record and all reasonable inferences derived therefrom in the light most favorable to [plaintiff]." *Scott v. Dist. of Columbia*, 101 F.3d 748, 759 (D.C. Cir. 1996). So viewing the record, "a

defendant's motion for summary judgment is to be denied only when . . . a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).[3]

### 1. Shooting of Louis

Officer Riggins maintains that he shot Louis because Louis was "assaulting" him and Officer Robinson "with a deadly weapon." (Riggins Dep. at 23-24; *see also id.* at 344.) Plaintiff argues that there are several disputed issues of material fact as to whether Officer Riggins's decision to shoot Louis was objectively reasonable, including (1) whether Louis was wielding the screwdriver when Officer Riggins discharged his firearm; and, if so, (2) whether Louis had attempted to stab Officers Robinson and Riggins; and, if so, (3) whether those attempted stabbings could have caused death or serious bodily injury. (*See* Pl.'s Statement of Material Facts in Disputed ("PSOF"), March 7, 2014 [Dkt. No. 38] ¶¶ 16, 20, 22; *see also* Opp'n at 17.)[4]

---

[3] Plaintiff asserts that the excessive force claims "will rarely be susceptible to summary judgment" because of the necessarily fact-bound nature of the objective reasonableness inquiry. (Opp'n at 9-10.) While the reasonableness inquiry is undeniably fact-bound and case-specific, *see Graham*, 490 U.S. at 396, this does not preclude summary judgment where there is no disputed fact material to the objective reasonableness of the use of force. *See, e.g.*, *Plumhoff*, 134 S.Ct. at 2024 (reversing circuit court's judgment denying summary judgment); *Scott*, 550 U.S. at 386 (same); *Lash v. Lemke*, 971 F. Supp. 2d 85, 93 (D.D.C. 2013) (granting summary judgment); *Armbruster*, 962 F. Supp. 2d at 115 (same); *Garay v. Liriano*, 943 F. Supp. 2d 1, 29 (D.D.C. 2013) (same); *White v. United States*, 863 F. Supp. 2d at 49 (same).

[4] Plaintiff "disputes" many other facets of defendants' statement of facts. (*See* Opp'n at 16-22; *see generally* Pl.'s Resp. to DSOF, March 7, 2014 [Dkt. No. 38].) However, these "disputes" generally consist of plaintiff "den[ying] this statement" without a citation to record evidence that creates a genuine issue of fact or even supports plaintiff's theory of the case. (*E.g.*, Pl.'s Resp. to DSOF ¶ 8.) Plaintiff's own "statement of material facts in dispute" is similarly unhelpful, as it consists of a hodgepodge of legal conclusions (*e.g.*, PSOF ¶¶ 2-3, 21), facts that are undisputed (*e.g.*, *id.* ¶¶ 6, 19), and allegedly "disputed" facts with record citations that fail to establish a genuine "dispute." (*E.g.*, *id.* ¶¶ 21-22.) As one example, plaintiff states that "Louis did not use a level of force that could have caused death or serious bodily injury when he was confronted by Defendant Riggins in his bathroom," citing Officer Riggins's deposition testimony. (*Id.* ¶ 22.) However, the cited testimony states the exact opposite: "Mr. Louis was using a level of force . . . that he can [sic] cause death or serious injury to me." (Riggins Dep. at 344.)

However, plaintiff's averments that these facts are genuinely disputed does not make them so. For plaintiff's allegations are unsupported by the record and based almost entirely on his theory that Officer Robinson and Riggins's testimonies are *post facto* rationalizations meant to insulate defendants from liability. (*See* Opp'n at 17 ("The only evidence that [Louis] was holding [the screwdriver] after the entry comes from Defendant Riggins and Officer Robinson, whose testimony the jury could disregard."); *id.* at 20 ("The jury could just as easily determine that Officer Riggins had invented this 'belief' to justify his use of lethal force.").) The Court is sensitive to the fact that in cases such as this one, where "the witness most likely to contradict [the officers'] story—the person shot dead—is unable to testify," it should "not simply accept what may be a self-serving account by the police officer[s]." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). However, the fact that an individual died after an encounter with police officers does not preclude summary judgment for those officers in a subsequent section 1983 action. *See, e.g.*, *Buruca*, 902 F. Supp. 2d at 86. For a Court cannot set aside the officers' testimony absent "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and . . . could convince a rational factfinder that the officer acted unreasonably." *Scott*, 39 F.3d at 915. As described below, plaintiff fails to identify any such circumstantial evidence.

---

Plaintiff cannot render this fact "disputed" by merely labelling it so. Plaintiff must "point[] to 'affirmative evidence' showing disputed material facts." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996) (quoting *Anderson*, 477 U.S. at 256-57); *see also Buruca*, 902 F. Supp. 2d at 82 ("The plaintiff can defeat the District's motion only if it points to 'particular facts' supported by 'materials in the record' to dispute the District's version of the story." (quoting Fed. R. Civ. P. 56(c)(1)(A))).

The Court notes that the purpose of Local Civil Rule 7(h)'s requirement that parties file respective statements of material fact is to "'isolate[] the facts that the parties assert are material, distinguish[] disputed from undisputed facts, and identif[y] the pertinent parts of the record.'" *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting *Gardels v. Cent. Intelligence Agency*, 637 F.2d 770, 773 (D.C. Cir. 1980)). "[A] district court judge should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988). Unfortunately, this is precisely the burden that plaintiff's failure to comply with Local Rule 7(h) has placed on the Court.

First, there is no genuine dispute as to whether Louis wielded the screwdriver and attempted to stab Officer Robinson. Both officers recounted that after Louis began to push against the bathroom door to prevent Officer Robinson from entering, he also began to try to stab Officer Robinson around the door with the screwdriver. (Riggins Dep. at 54, 320, 346; Robinson Dep. at 197.) In addition, the officers recovered the screwdriver from the bathroom after the altercation. (FIT Report at 4.) Plaintiff offers no *evidence* to undermine this consistent testimony of the officers and the physical evidence from the scene.[5]

Second, there is no genuine dispute as to whether Louis also threatened Officer Riggins with the screwdriver. Officer Riggins testified that after he dropped his OC spray and drew his service pistol, Louis raised the screwdriver in a stabbing motion in his direction. (Riggins Dep. at 317.) Plaintiff argues that Officer Riggins's testimony should be disregard as "implausible" because (1) Officer Robinson testified that Louis did not decrease his resistance on the door before Officer Riggins shot him; (2) Officer Riggins himself testified that Louis remained in contact with the door at all times; and (3) Officer Riggins shot Louis in the side of the shoulder and head, which is inconsistent with a frontal attack by Louis. (Opp'n at 20-21; Pl.'s Response to DSOF, March 7, 2014 [Dkt. No. 38] ¶ 4.) On this basis, plaintiff contends, a jury could conclude Louis was not threatening Officer Riggins. However, this purported "implausibility" in Officer Riggins's testimony is solely of plaintiff's invention. Officer Riggins never testified that Louis turned and approached him head on. Instead, Officer Riggins testified consistently that Louis, who remained in contact with the door throughout the encounter (Riggins Dep. at 48, 194, 317-19), was "never facing" him and kept his body "always towards the side," even when he

---

[5] Plaintiff argues that "there is no evidence that [Louis] could have reached a screwdriver around the door to pose any threat to Officer Robinson based on how [Louis] was positioned and built." (Opp'n at 19-20.) However, the officers' unrebutted testimony provides that evidence. That testimony is not so facially implausible as to create a genuine issue of material fact.

threatened Riggins with the screwdriver.  (*Id.* at 318, 347.)  Thus, the fact that Officer Riggins

shot Louis in the side of his shoulder and head is completely consistent with the Riggins's

testimony of Louis's threatening actions.[6]

Finally, there is no genuine dispute as to whether Louis could have caused death or

serious bodily injury to Officers Robinson and Riggins.  It is undisputed that Louis was

attempting to stab the officers with a screwdriver with an artificially sharpened seven-inch

blade—the same screwdriver with which he had stabbed Officer Sarita hours before.  Not only

have courts concluded that attacks by a suspect wielding similarly-sized knives are sufficiently

dangerous to justify the use of deadly force, *e.g.*, *Samuel v. City of Broken Arrow*, 2011 WL

6029677, * 4-6 (N.D. Okla. Dec. 5, 2011) (ten-inch knife with five-inch blade), but several

courts specifically have held that screwdrivers, when wielded as weapons, may justify the use of

deadly force.  *See J.P. ex rel. Balderas v. City of Porterville*, 801 F. Supp. 2d 965, 981-83 (E.D.

Cal. 2011); *Nicarry v. Cannaday*, 260 F. App'x 166, 170 (11th Cir. 2007).  During the encounter,

Louis was at most five feet away from Officer Riggins and was stabbing around the door at

Officer Robinson.  The protective gear worn by the officers left their necks, arms, and thighs

exposed and the shields were not designed to protect officers from sharp objects.  Under these

undisputed facts, no reasonable jury could conclude that Louis did not pose a threat of serious

harm to the officers.

---

[6] This fact distinguishes the case from *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999), and
*Fenwick v. United States*, 926 F. Supp. 2d 201 (D.D.C. 2013).  In *Abraham*, the Third Circuit considered
whether the evidence established that the police officer acted in self-defense when he shot the decedent as
he attempted to escape in a car.  183 F.3d  at 293-96.  Although all of the witness testimony supported the
officer's claim that he was *in front* of the car (and thus at risk) when he shot the suspect, the physical
evidence that the bullet entered through the car's side window, striking the decedent in the arm before
entering his chest, undermined the witness and officer testimony, and precluded summary judgment.  *Id.*
at 293-94.  Similarly, in *Fenwick*, video evidence created a triable issue of fact as to whether the
defendant police officer was in danger of being hit by the suspect's car when he fired his service weapon.
926 F. Supp. 2d 227-28.  Here, plaintiff fails to identify similar contradictory evidence.

Thus, the Court is left with a fairly simple, albeit unfortunate, case. After Officer Riggins entered the bathroom, and before Officer Robinson could do so, Louis resisted by pushing against the bathroom door and attempting to stab the officers—first Officer Robinson and then Officer Riggins—with the same artificially sharpened screwdriver with which he had stabbed Officer Sarita. In response to Louis's attacks, Officer Riggins discharged his firearm twice, striking Louis in the side of the shoulder and head, killing him. All of this occurred in fewer than ten seconds. While, with hindsight, it is easy for plaintiff to say that Officer Riggins should have approached the situation differently—by using non-lethal force, or by retreating out of the bathroom, or by trying to verbally reason with Louis—that is not what the Constitution requires. *Graham*, 490 U.S. at 396. The Constitution allows police officers to make split-second decisions regarding the use of force, including the reasonable decision to use lethal force when a suspect threatens serious physical harm upon another officer. *See Garner*, 471 U.S. at 11.[7] No reasonable jury could disagree that Louis posed such a threat to Officers Robinson and Riggins. Accordingly, no reasonable jury could conclude that under the totality of the circumstances Officer Riggins's use of deadly force was so excessive that no reasonable officer could have believed it was lawful. *See J.P. ex rel. Balderas*, 801 F. Supp. 2d at 981-83 (police officer acted

---

[7] Plaintiff's argument that Officer Riggins's actions were unreasonable under *Garner*, because there was no risk of Louis escaping and Officer Riggins did not give a verbal warning before firing, is misplaced. (Opp'n at 15.) *Garner* itself clarified that warning was required only "where feasible." 471 U.S. at 11-12; *accord Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1321 (10th Cir. 2009) ("A warning is not invariably required even before the use of deadly force."). Moreover, as the Supreme Court has clarified, "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott*, 550 U.S. at 382. While *Garner* considered the use of deadly force to prevent the escape of felony suspects, 471 U.S. at 11-12, it *did not* limit the use of deadly force to situations where escape was possible or imminent. *Scott*, 550 U.S. at 382. "*Garner* was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation" – namely, where a police officer had shot a young, unarmed burglary suspect who posed no threat to anyone merely to prevent his escape. *Id.* (citations omitted). "Whatever *Garner* said about the factors that *might have* justified shooting the suspect in that case, such 'preconditions' have scant applicability to this case, which has vastly different facts," *id.*, including the suspect's attack of the police officers with a dangerous weapon.

reasonably when he fatally shot suspect who was approaching with a screwdriver raised, having earlier stabbed another police officer); *Nicarry*, 260 F. App'x at 170 (police officers acted reasonably when using deadly force on suspect who was charging with a screwdriver).

2. *Breach of the bathroom door*

In his opposition, plaintiff also argues that the *breach* of the bathroom door was an independent and unreasonable use of force that violated Louis's constitutional rights. (Opp'n at 25-26.)[8] Officer Riggins responds that because he did not make the decision to breach the door (Glover Dep. at 105), and did not personally breach the door (DSOF ¶ 1), he cannot be held personally liable for that alleged excessive use of force. (Reply at 18.) As an initial matter, although Officer Riggins did not personally breach the bathroom door, he was a member of the four-person team that executed the plan to breach the door and apprehend Louis. Federal common-law tort principles govern the application of section 1983. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). And it "'is axiomatic that where several independent actors concurrently or consecutively produce a single, indivisible injury, each actor will be held jointly and severally liable for the entire injury.'" *Wesby v. Dist. of Columbia*, 841 F. Supp. 2d 20, 41 (D.D.C. 2012) (quoting *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985)). Considering the evidence in the light most favorable to plaintiff, a reasonable jury could find Officer Riggins jointly and severally liable for any unconstitutional actions taken by his fellow officers when they collectively implemented the plan to breach the door and enter the bathroom.

However, there is no material question of fact as to the objective reasonableness of the breach of the bathroom door. It is undisputed that after the police officers' first encounter with Louis—which culminated in Louis stabbing an officer—the specialist ERT was called in to

---

[8] The Court agrees with defendants that it is questionable whether plaintiff's complaint can be fairly read to encompass this claim. (*See* SAC ¶¶ 20, 42-43; Reply at 3-4 ns.1-2.) However, the Court does not address this issue, as the claim nonetheless fails on the merits.

handle the barricade situation.  The ERT negotiators unsuccessfully attempted to create a

dialogue with Louis for around an hour and a half.  When Louis went silent for an extended

period of time, ERT members confirmed that Louis appeared to have either passed out or fallen

asleep in the bathroom.  Based on this information, Lieutenant Glover decided to breach the

bathroom on his belief that the situation presented an opportunity to take Louis into custody

without incident.   Only then did the four-man team breach the door and attempt to apprehend

Louis.

This case is thus distinguishable from those cases plaintiff cites where a reasonable jury

could find that police officers' decisions to breach a house or room in a barricade situation was

objectively unreasonable.  In *Estate of Smith v. Marasco*, 430 F.3d 140 (3d Cir. 2005), the Third

Circuit concluded that, considering the evidence in the light most favorable to plaintiff, it was

objectively unreasonable for police officers to "storm [the suspect's] shed and house using flash-

bang grenades" considering, *inter alia*, that the officers knew that the suspect was a mentally

unstable Vietnam War veteran suffering from intermittent war flashbacks, post-traumatic stress

disorder, and a heart condition.  *Id.* at 151-52.[9]  Importantly, however, *Smith* hinged entirely on

the officers' use of flash-bangs and said nothing of the reasonableness of the *general* decision to

breach the shed or house to confront the mentally unstable, potentially dangerous suspect.  *See*

*id.* at 152 ("It is useful to compare the decision to activate [the tactical team] with the decision to

enter Smith's house and shed *using the tactics employed here*." (emphasis added)).  In this case,

the officers' method of breaching the bathroom door is simply not comparable to the officers'

use of flash-bang grenades when storming the suspect's shed and house in *Smith*.  Thus, *Smith* is

inapposite.

_____

[9] The *Smith* court also considered the fact that nearly six hours had passed between the initial
complaint bringing police to the suspect's house and when the tactical team stormed the house, during
which time no officer had made contact with the suspect.  430 F.3d at 151.

Although more similar to this case, *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), is also distinguishable.[10]  In that case, two officers responded to a call from a social worker seeking to detain Sheehan, a woman with an established mental illness, for a seventy-two hour psychiatric evaluation and treatment.  *Id.* at 1217.  The social worker informed the police that Sheehan was known to make violent threats, had threatened to kill him with a knife, and was currently in her room on the second floor, from which the only exit was a door into the hallway.  *Id.* at 1217-18.  When the officers entered Sheehan's bedroom (using a key), Sheehan, holding a large knife, slowly approached them and repeatedly stated that she would kill them if they did not leave her room.  *Id.* at 1218-19.  The officers retreated from Sheehan's bedroom and called for backup.  *Id.* at 1219.

Similarities between *Sheehan* and this case, however, end there.  Rather than waiting for backup and providing Sheehan the opportunity to calm down, the officers immediately and forcibly reentered Sheehan's room with service weapons drawn.  *Id.*  As could be expected, Sheehan began attacking the officers with her knife, at which point they discharged OC spray without effect and then fired their service weapons, hitting Sheehan at least five times.  *Id.* at 1219-20.  The Ninth Circuit concluded that, although Sheehan's attack justified the officers' use of deadly force, *id.* at 1229-30, a reasonable jury could find the officers' decision to enter the bedroom a second time was objectively unreasonable.  *Id.* at 1225-27.[11]  The Ninth Circuit

---

[10] *Sheehan* was decided after defendants filed their motion for summary judgment, but before plaintiff filed his opposition.  Although the parties did not address *Sheehan* in their summary judgment briefs, plaintiff later filed a notice of supplemental authority with the Court, to which defendants responded.  (*See* Pl.'s Notice of Suppl. Auth., April 9, 2014 [Dkt. No. 44]; Response to Pl.'s Notice of Suppl. Auth., April 25, 2014 [Dkt. No. 45].)

[11] The Ninth Circuit also concluded that, taking into account the events leading up to the officers' use of deadly force, a reasonable jury could find that the officers recklessly provoked the violent confrontation, exposing them to liability for the otherwise defensive use of deadly force.  *Sheehan*, 743 F.3d at 1230.

faulted the officers breaching the door before their specialized backup could arrive "without a countervailing need" for doing so.  *Id.* at 1226-27.  The officers had no reason at that point to enter the bedroom when they knew a deadly confrontation was likely:  there was no evidence Sheehan was a threat to herself or—without means of escaping her bedroom—other people.  *Id.* at 1226-27.[12]

In contrast to the officers in *Sheehan*, the responding officers in this case, after their initial confrontation with Louis, waited for their specialized backup:  the ERT.  The ERT attempted to negotiate with Louis, albeit unsuccessfully, for over an hour and a half.  It was only *after* the ERT had evidence that Louis—silent for nearly twenty minutes—had passed out or fallen asleep that Lieutenant Glover ordered the four-man team to breach the door.  Unlike *Sheehan*, where the officers had no reason to forcibly enter her room at that time, Lieutenant Glover's decision to breach the door was not made in total disregard for Louis's safety.  *See Sheehan*, 743 F.3d at 1226-27; *see also Estate of Smith*, 430 F.3d at 151-52.  Instead, the officers here had a reasoned basis for their action:  Louis's apparent unconsciousness provided an opportunity to apprehend him without incident.  Far from disregarded, Louis's safety was paramount in Lieutenant Glover's decision to breach the bathroom door at that time.

---

[12] The Ninth Circuit also relied significantly on expert testimony that the officers had departed from departmental policy.  *Sheehan*, 743 F.3d at 1225-26.  Plaintiff's expert, in a conclusory and inflammatory Rule 26(b)(4) statement, offered similar proposed testimony for this case.  (*See* Rule 26(b)(4) Statement of James E. Bradley, Jr., June 10, 2013 [Dkt. No. 20] at 6 (concluding, with little supporting analysis, that Officer Riggins's actions "violated . . . the published general orders of the Metropolitan Police Department".)  However, in this Circuit, whether Officer Riggins violated MPD policy is "irrelevant" to the Fourth Amendment analysis.  *English v. Dist. of Columbia*, 651 F.3d 1, 9 (D.C. Cir. 2011) (citing *Whren v. United States*, 517 U.S. 806, 815 (1996)).

Under the totality of the circumstances, no reasonable jury could find that the officers acted in an objectively unreasonable fashion when breaching the bathroom door.[13]  Even considering the evidence in the light most favorable to the plaintiff, Lieutenant Glover's decision, after hours of failed negotiation, to take advantage of an apparent opportunity to apprehend Louis without incident, was reasonable.  *Cf. McCracken v. Freed*, 2006 WL 83452, at *10 (E.D. Pa. Jan. 6, 2006) (forcible entry into home using pepper spray was reasonable when hours of attempted negotiations failed and plan to enter home was made in consideration of the safety of all parties involved).  That the plan failed is ultimately irrelevant to the question of whether the plan, as executed, was objectively reasonable.

In the alternative, it is arguable that Officer Riggins would be protected by qualified immunity because he was merely following his superior officer's objectively reasonable order to breach the bathroom door.  The Court recognizes that thirty years ago the D.C. Circuit refused to accept a "just following orders" defense from defendants who had complied with an agency's approved policy.  *See Hobson v. Wilson*, 737 F.2d 1, 67 (D.C. Cir. 1984) ("In its most extreme form, this argument amounts to the contention that obedience to higher authority should excuse disobedience to law, no matter how central the law is to the preservation of citizens' rights.  We have no hesitation in rejecting this new argument.").  However, the D.C. Circuit did *not* foreclose the possibility of the defense applying in another case.  *See Wesby*, 841 F. Supp. 2d at 40 ("[O]ur Circuit has specifically rejected the argument that immunity *automatically* attaches were public officials violate a citizen's rights at the direction of higher authority." (emphasis added)).  Indeed, as other Circuits have held in cases more recent than *Hobson*, a "just following orders" defense may establish qualified immunity when "plausible instructions from a superior or fellow

---

[13] For the same reasons, no reasonable jury could find that the officers recklessly failed to take into account Louis's mental state when breaching the bathroom, thereby provoking a deadly confrontation that could have been avoided.

officer . . . viewed objectively in light of the surrounding circumstances . . . could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 199 (3d Cir. 2005) (citing *Bilida v. McCleod,* 211 F.3d 166, 174-75 (1st Cir. 2000)); *see also Varrone v. Bilotti*, 123 F.3d 75, 81-82 (2d Cir. 1997); *Villanueva v. George*, 659 F.2d 851, 855 (8th Cir. 1981) (en banc). Here, because there is no genuine dispute as to whether a reasonable officer in Officer Riggins's position would have concluded (correctly) that the "necessary legal justification" existed for breaching the bathroom door, the Court concludes it is at least arguable that Officer Riggins is independently protected by qualified immunity pursuant to the "just following orders" defense.

Accordingly, in light of all of the facts and circumstances, no reasonable jury could find that Officer Riggins's participation in the breach of the bathroom door or ultimate use of deadly force against Louis was so excessive that no reasonable officer could have believed it was lawful. Therefore, Officer Riggins is entitled to qualified immunity on plaintiff's section 1983 excessive force claim, and the Court will grant his motion for summary judgment as to Count V. *See Armbruster v. Frost*, 962 F. Supp. 2d 105, 115 (D.D.C. 2013).

### B.    Count VI – *Monnell* Claims

In Count VI of his second amended complaint, plaintiff brought a separate section 1983 claim against the District of Columbia based on the MPD's alleged unconstitutional policies and failure to properly train its employees. (SAC ¶¶ 45-54; Opp'n at 31-32.) A municipality's liability under section 1983 is limited. *See Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."). For

a *Monell* claim to survive a municipal-defendant's motion for summary judgment, the Court must conclude that there is evidence both (1) of a "predicate constitutional violation" and (2) "that a custom or policy of the municipality caused the violation." *See Baker v. Dist. of Columbia*, 326 F.3d 1302, 1305 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992)); *accord Brown v. Dist. of Columbia*, 514 F.3d 1279, 1283 (D.C. Cir. 2008); *Konah v. Dist. of Columbia*, 971 F. Supp. 2d 74, 81 (D.D.C. 2013).

Because the Court will grant summary judgment for Officer Riggins as to plaintiff's excessive force claims, plaintiff has failed to demonstrate the requisite "predicate constitutional violation" for *Monell* liability in this case.[14]  Thus, the Court will grant summary judgment for the District as to Count VI.

## III.  STATE-LAW CLAIMS

In Counts I-IV, plaintiff brings state-law negligence, assault and battery, survival action, and wrongful death claims against Officer Riggins and the District.  (*See* SAC ¶¶ 28-40.)  When, as here, the Court will grant summary judgment for defendants as to the federal-law claims providing the Court with original jurisdiction, the Court "may decline to exercise supplemental jurisdiction" over the remaining state-law claims.  28 U.S.C. § 1367(c)(3); *accord Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005).  Supplemental jurisdiction "is a doctrine of

---

[14] Even had plaintiff demonstrated that Officer Riggins, or some other officer, used excessive force on Louis, plaintiff (and his expert) failed to identify evidence sufficient to demonstrate that District "custom or policy caused the claimed violations of his constitutional rights."  *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).  There is no evidence that any policy "explicitly adopted" by the District was "'the moving force of the [alleged] constitutional violation.'"  *Id.* at 39 (quoting *Monell*, 436 U.S. at 694).  Nor is there evidence that a policymaker "knowingly ignore[d] a practice that was consistent enough to constitute custom."  *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)).  Finally, there is no evidence that the District acted with "deliberate indifference" as to the constitutional violations alleged here—*i.e.*, "knew or should have known of the risk of [the alleged] constitutional violations," but did not act to prevent them.  *Baker*, 326 F.3d at 1307 (citing *Farmer v. Brennan*, 511 U.S. 825, 840-41 (1994)).  Proof of a single constitutional violation cannot, alone, establish an actionable policy or custom under *Monell*.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).  Plaintiff's failure to identify a policy or custom actionable under *Monell* provides an alternative basis for the Court's determination that summary judgment for the District is appropriate as to Count VI.

discretion, not a plaintiff's right." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966). In deciding "whether to exercise [its] jurisdiction," the Court "should consider and weigh . . . the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

Although the state- and federal-law claims in this case share "a common nucleus of operative fact," *see Armbruster*, 962 F. Supp. 2d at 116, the Court concludes that convenience, fairness, and comity disfavor this Court's consideration of plaintiff's state-law claims—some of which raise complex state-law issues. The Court will therefore dismiss plaintiff's Counts I-IV without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion for summary judgment [Dkt. No. 35] as to plaintiff's federal-law claims and dismiss plaintiff's remaining state-law claims without prejudice for lack of jurisdiction.. An Order consistent with this Memorandum Opinion will be issued on this day.

_____
            /s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE: July 23, 2014